Good morning, Your Honors. Johnson Lazaro for the petitioner in this matter. Your Honors, this case is about a father or a daughter who is seeking asylum in the United States based on the persecution that they've experienced in the Philippines in the hands of the New People's Army, a small communist group who have given widespread violence all over the Philippines. What really made them come to the U.S. is the murder of their son and two nephews, who they believe to be at the hands of the New People's Army. The New People's Army tried to convince them or tried to indoctrinate them to join their group. They opposed this, and as retaliation, their son was murdered. And that's why they made the decision to get out of the Philippines and come to the United States. Now, during the trial of this case, it was very interesting that the judge found his testimony to be very credible. But we can see that the evidence was parsed. The documentary evidence was parsed. But it is extremely difficult, as you know, Your Honors, to obtain hard evidence in these types of asylum cases. But the very fact that the immigration judge found my client to be credible should have a lot of weight in granting this asylum case. We are also disappointed that the BIA did not give us a more lengthy opinion. They gave us an affirmative, an affirmance of the opinion with no narrative reasoning as to why they came up with that decision, knowing full well that the immigration judge found my client's testimony to be very credible. You contend that the evidence before the IJA compels the finding that there was past persecution? Yes, Your Honor. And what do you base that? We base that on the death threats that was experienced by my client, death threats, the letters condemning them to die if they continue to participate, continue to oppose the ideology of the NPA. Also, the murder of the son of my client and the nephews. We believe that to be persecution as well. But the murder of your client's son occurred before he became an informer. Is that correct? That's correct, Your Honor. That's correct, Your Honor. Now tell me about the murders of the nephews. Were the nephews associated with their uncle in any capacity, apart from obvious family relationship? Yes, Your Honor. After the son was murdered, the father convinced the two nephews to join him to become informants for the government, informing the government of the activities of the NPA. And because of that, the NPA retaliated against the nephews, and they were murdered as well. Okay. I have nothing further. I think we have your argument at hand. Why don't you save some for rebuttal, and we'll hear from the government. Thank you, Your Honor. Thank you. That should be ten minutes. Hold on. There you go. Good morning, Your Honors. May it please the Court. My name is Allison Drucker. I'm here representing the United States. This is an asylum case in which relief already has been denied three times by an administrative officer, by an immigration judge, and by the BIA. Under the substantial evidence test of Elias Zacharias, the Court must affirm the BIA unless the evidence compels a contrary result. Because the Board affirmed without separate decision this case, the Court is reviewing the immigration judge's decision. The immigration judge not only found no past persecution, but he also found no well-founded fear based on changed conditions. And I would like to just insert here that what Petitioner's counsel has said about sort of his theory of the facts of the case differs a little bit from what comes across in the testimony. The son apparently, the allegations are in the testimony that the NPA attempted to recruit the son. You seem to be having difficulty hearing me. The NPA attempted to recruit the son, and the son subsequently was found killed. That was in 1984. That was not per se the reason why the Petitioner himself and his daughter, who are also in the case, came to the United States. Rather, Petitioner said he became an informer against the NPA, and he did that for six years. And then only at a later point in 1990, when it became very dangerous, then he was motivated to come to the United States. In our view, this case can be decided on the well-founded fear aspect alone. The immigration judge, at pages 61 and 62 of the record, cited extensively to country reports. And I'd like to just read some of that. Although during the 1980s the NPA had a presence in many parts of the country, by 1996 it numbered fewer than 8,000 members. Moreover, it was a significant presence in less than 2 percent of the country, principally on the southern island of Mindanao. Let's see. You're not reading from the decision. You're reading from the country reports, right? I'm sorry, what? You're not reading from the decision? I'm reading from the immigration judge's decision of July 24, 1998. I see where you are. All right. Yes, we've read that. Thank you. You're reading his quotation of the country reports, right? I am. That's right. He relied on this. In this particular case, because it has to be individualized, it's a little bit different from some others because he testified, and his testimony was credited by the immigration judge, that the police told him that he was not safe anywhere in the Philippines and had to leave. That's different from many of the claims that we see. Well, what the police told him, what the police told him at the time, okay, first of all, there's what the immigration judge was saying about the country reports. But in addition, the immigration judge also on page AR62 mentioned that there were further developments even later, that the Philippines had had several elections and President Ramos had announced and granted amnesty to the NPA. The situation clearly has changed. That's a direct quote. You mean asylum? Yes. Asylum. I'm sorry, Ms. Unless they had, you know, some more substantial evidence, he doesn't have evidence of being threatened after, I think he said that his sister-in-law had reported that people were looking for him as late as, I think it was 1997. But the situation was already declining with the NPA before that point. And now the NPA doesn't really exist at all as a viable organization. So there really isn't much of a reason. Even today. Right. But even at the time of the board decision in this case also. But his testimony was they were looking for him. I mean, the board decision was in, well, the IJ's decision was in 1998. So he testifies that the year before they were looking for him. Right. That's what our record is. Okay. Well, I'd also like to comment on that. I mean, yes, it's true that the wife's sister told him that they were seeking him as late as 1997. That's from page 150 in the administrative record. However, it's sort of interesting, there's another part, well, two things here. One is that during the same testimony, the petitioner conceded that his adopted daughter and his wife's sister themselves had no problems. They were still back in the Philippines. That's at page 156 of the administrative record. Now, in addition, there's something at page 162 and 163 of the administrative record. And this is not talking about the sister-in-law, but it's talking about someone else, a friend. I guess they lived in this friend's house for a while. And the friend claimed that NPA people were coming and looking for them. Okay. Here's the testimony. Okay. Your friend informed you that the NPA found you. How did he know? Because he knows this community. Who's staying here? And these were faces, suspected faces there. So if that's the sort of basis, that's pretty slim to identify people as NPA on that basis. There's nothing more in this record than that sort of suggestion about the sister-in-law claiming that NPA people were looking. It's just his testimony about what the sister said. There's not an affidavit or a declaration or anything more definite. Therefore, we believe that this record does not compel under a correct understanding of Elias Zacharias a reversal on the well-founded fear issue. Let me just clarify. I just want to make sure I understand the government's position. I gather by your argument, you agree that the threats to his life and safety under our case law would be sufficient to qualify for him to make a showing that he had a reasonably, a reasonable subjective and objective and objective belief about his fear of future persecution should he go back. Well, I think there are even some questions about that. But I think we're on stronger ground, frankly, on the well-founded fear issue. Right. So then you come back and you say, well, there's changed country conditions. Right. Okay. But I think the question is, if the analysis is incorrect as to past persecution, then the IJ did not apply the presumption correctly and it must be sent back for analysis. Well, he didn't speak about the presumption, but he certainly very definitely reached, dealt with and decided about changed conditions. And I think that that was all totally supported by the evidence in the record. How do you distinguish the discussion that the IJ had in this case about changed country conditions with our en banc case in Borja where we rejected the 1995 report, which contains similar reassurances about the diminishing role of the NPA? Well, I'm not familiar with every sentence of Borja, but here there's also the reference to the granting of amnesty, which I think is very significant. And I notice that Petitioner did not object to that statement or to the truth of that statement. In fact, he alludes to it and seems to accept it in his notice of appeal to the BIA, which is in the record also. As I was saying, on the past persecution, Petitioner cites Molina for the proposition that death of relatives plus threats can be past persecution. I think there are some problems with that. One is that the death of his son isn't really directly connected, as I was trying to suggest before, with what happened to him. No, but how about the nephews? I'm sorry? The nephews. Well, the nephews, there's more in the briefs than there is in the actual testimony about the nephews. There are some references in the administrative record about this. There's a death certificate that purports to be of one of them at page 226, and there's some reference in his declaration, pages 311 and 312. But actually, the Petitioner did not testify about the nephews. So it's not really very fleshed out why he thinks the nephews were killed by the NPA or why this shows that the NPA, you know, had something, they were coming after him. And the burden of proof is on the Petitioner to come forward with these details. He has the burden of proof at all times. But the IJ made a finding on that. The IJ says two of his nephews were ambushed by the Sparrow Unit, which is the death squad of the NPA, on page 58. Much for that. Well, okay. Take a look at the second. I'm looking at it. I think that's, well, I think that's generous, but I guess if that's what he said. Right. So if that is true, why doesn't a death threat coupled with murder of the nephews who are associated with him constitute enough under our case law to establish past persecution? If I guess under what the immigration judge is saying here, if you accept that as correct, then probably it is. Okay. Judge Graber, do you have any questions? I don't. Thank you, though. Okay. Thank you, counsel. Did you have any questions at all about his other point concerning the affirmance without opinion, the streamlining? Well, actually, I do have one question that occurs to me. The daughter's asylum claim is separate because she was not a minor. She was some 30 years old at the time of the hearing. What is your position on her separate claim, what she has shown with respect to past persecution or well-founded fear of future persecution? My understanding is that we've been treating her claim as being, you know, dependent on what happens in the father's case throughout this. So it's your position that if he demonstrated past persecution, so did she, even though she was not a minor? Well, I think that the petitioner's theory is that, you know, that there was imputed political opinion. I'm not really sure what her political opinions were or how they were expressed, but at least that the NPA would have imputed political opinion to her. So I think that's how we would take this. Okay. Counsel, thank you for your argument. Do you want a rebuttal? Your Honors, I just wanted to comment briefly on the change condition country reports issue. That's true. There are country reports that the NPA activities are declining, but really that the statement of the immigration judge is an overgeneralization, a sweeping generalization of what's happening in the country right now. There are just recently in the news some bombings that have occurred in Metro Manila, possibly by terrorist groups such as Abu Sayyaf and possibly by the NPA. It's still currently an investigation. There are still isolated incidents in the countryside of threats and violence perpetrated by the NPA. So the change country conditions and country reports are, I mean, it's a generalization that does not give individual analysis to the case at hand, Your Honor. What's your view on the petition, the daughter's petition? Well, we believe that because of the persecution of the father, because of their close relationship that the daughter is also being persecuted or will be persecuted if she returns to the Philippines, Your Honor. But really the claim seems to be completely derivative, isn't it? I mean, is there anything in the record that's independent of the father's claim? No. Okay. Very good. Thank you. Thanks.  We thank counsel for their arguments. The next case on the oral argument, Calendars, United States v. Staggs.
judges: Thomas, Graber, Paez